BREVATOR, Appellant, v. BREVATOR CREECH et al.

Division Two, February 21, 1905.

1. **SPECIFIC PERFORMANCE:** Offer to Give Land: To Pay Debt: Acceptance. Deceased in her old age wrote to plaintiff, her daughter-in-law, of whom she was very fond, and who lived with her husband and children in a distant State, that she was "a little suspicious of her son," that she would "write him again before very long and propose to deed him a few hundred acres of land and give him a good start in hogs, cattle, etc," and asked her to use her "best ·influence to bring him home here," and then, after acknowledging her duty to pay her for "the many years you worked for me while you stuck to me like a good daughter and got nothing in return" and "to pay you the money I borrowed from you," and referring to a lot of cattle which had been "set apart to help pay you for moneys due from me;" stated: "I therefore promise to pay you at least $4,000 in cash within two years after you arrive back home" and "I positively agree that at my death you shall have my home place" consisting of 413 acres of land, and then stated, "This land to you, together with the $4,000 cash, I think no more than a just recompense for all that you have done for me in the past years." To this letter plaintiff responded that they would return "in the spring," and the next spring·plaintiff sold her residence there, and says she induced her husband to give up his position there and return to his mother's homestead. On their arrival they moved into a house on another part of the plantation, and the tract to which they were assigned, consisting of 455 acres, was deeded to the son

by his mother just prior to her death, and in the partition of the estate this tract of 455 acres was included in the share set off to him, as was the "home place" mentioned in the letter to plaintiff. While the partition was being made the commissioners stayed for sometime with plaintiff and her husband and she made no claim to the "home place" which was assigned to her husband, and for which, while the partition proceeding was still pending, she brought this suit for a specific performance of the alleged contract contained in the letter. *Held, first,* if the letter is to be understood as a promise to pay $4,000 and convey the 413 acres of land in satisfaction of money loaned and services performed; the plaintiff's remedy is by an action at law on the debt itself; *second,* if the letter is a promise to give plaintiff the 413 acres of land, a suit for specific performance does not lie, for a bill in equity does not lie to enforce a performance of a voluntary promise of a gift; *third,* the bill can not be sustained on the theory that, relying on the deceased's promise to convey her the land, she sacrificed her dwelling house, induced her husband to give up a lucrative position, and returned, for the evidence does not show that she sold her home at a sacrifice or a loss, but on the contrary shows that her husband was out of employment and in debt and that deceased furnished the money which paid their expenses back to Missouri, and they were installed in the house on the 455 acres free of rent, and her condition in life was much improved by the change, and thereafter she rendered deceased no service.

2. ————: **Right to.** A specific performance of a contract is not a matter of course. On the other hand, the refusal of the chancellor to decree performance must not be arbitrary or capricious, but the exercise of a sound judicial discretion.

Appeal from Pike Circuit Court.—*Hon. David H. Eby,* Judge.

Affirmed.

*Norton, Avery & Young* and *Hostetter & Jones* for appellant.

(1) The authority of the husband, O. P. Hedges, who acted as agent for his wife, was sufficiently established, as was also the genuineness of the letters pleaded and offered in evidence from Mrs. Hedges to Lizzie Brevator. R. S. 1899, sec. 4556; Humbolt v. Mill Co., 77 Mo. App. 672; Long v. Martin, 152 Mo.

675. (2) The description of the land, for which specific performance is asked, was sufficiently definite to locate the land. Hunter v. Patterson, 142 Mo. 310; Walton v. Drumtra, 152 Mo. 489; Cravens v. Pettit, 16 Mo. 210; Briant v. Garrison, 150 Mo. 655; Rines v. Mansfield, 96 Mo. 394; Presbell v. Headley, 141 Mo. 194; Thompson v. Thompson, 115 Mo. 67; Nichols v. Boswell, 103 Mo. 160; Wolf v. Dyer, 95 Mo. 547; Johnson v. Boulware, 149 Mo. 457; Brown v. Walker, 11 Mo. App. 226; Nelson v. Brodhack, 44 Mo. 596; Fenwick v. Gill, 38 Mo. 510; Kroneberger v. Hoffner, 44 Mo. 185; Hogan v. Page, 26 Mo. 55; McGill v. Somers, 15 Mo. 80; Foulk v. Colburn, 48 Mo. 225; West v. Bretellé, 115 Mo. 653; Smith v. Catlin, 117 Mo. 438; Harding v. Wright, 119 Mo. 1; Burnham v. Hitt, 143 Mo. 424. (3) It was unnecessary that the contract should specify whether the land was to be conveyed by deed, will or otherwise. Sutton v. Hayden, 62 Mo. 101. (4) It makes no difference if John Brevator returned from Washington at the instigation of his mother. Under the evidence, the judgment should have been for plaintiff, and specific performance should have been enforced. Sutton v. Hayden, 62 Mo. 101; Sharkey v. McDearmon, 91 Mo. 647; Healey v. Simpson, 113 Mo. 340; Nowack v. Berger, 133 Mo. 24; Hall v. Harris, 145 Mo. 614; Wright v. Tinsley, 30 Mo. 389; Gupton v. Gupton, 47 Mo. 37; Hyatt v. Williams, 72 Mo. 214; Fuchs v. Fuchs, 48 Mo. App. 18; Hollman v. Conlon, 143 Mo. 369; Glass v. Roe, 103 Mo. 513; Veth v. Gierth, 92 Mo. 97; Hill v. Mining Co., 119 Mo. 9; Paris v. Haley, 61 Mo. 453; McKee v. Higbee, 180 Mo. 263.

*Martin & Woolfolk, Wheeler & Powell* and *E. W. Major* for respondents.

(1) Courts of equity have uniformly adhered to the rule that a contract for the conveyance of land will not be specifically enforced unless the contract is cer-

tain and definite in all its terms and in all its parts. 26 Am. and Eng. Ency. of Law (2 Ed.), 32. Specific performance will only be decreed where a specifié thing is agreed to be conveyed, and never where the description is so uncertain as to leave a reasonable doubt in the mind of the chancellor as what property it covered. Shelton v. Church, 10 Mo. 774; Paris v. Haley, 61 Mo. 453; Foster v. Kimmons, 54 Mo. 488; Tedford v. Trimble, 87 Mo. 226; Hill v. Coal Co., 119 Mo. 9; Smith v. Welson, 160 Mo. 657; Windover v. Baker, 121 Mo. 294; King v. King, 7 Mo. 389; Reuger v. Holtzclaw, 112 Mo. 519; Boyd v. Paul, 125 Mo. 9; Schroeder v. Tooffe, 11 Mo. App. 257. (2) The contract alleged in the petition has not been established. Section 747, Revised Statutes 1899, provides that no instrument of writing shall be received in evidence without proof of its execution in any suit against an executor or administrator or any person representing the person charged to have executed such instrument. Catherine Hedges being dead, proof of the execution of the letter became necessary. O. P. Hedges, the husband, was not a competent witness to prove its execution (sec. 4656, R. S. 1899), especially as the marriage relation existed between them at the date of the instrument. Stillwell v. Patton, 108 Mo. 352. He can not prove his agency for the wife unless he is a substantial party to the suit. Basye v. Railroad, 65 Mo. App. 468. O. P. Hedges can not prove his authority to act for his wife in this case as was done in Long v. Martin, 152 Mo. 668, for two reasons: In Long v. Martin the wife was living and both she and her husband testified upon the question of the husband's agency; and second, the evidence in that case shows that the authority of the husband to act for the wife was given in the presence and hearing of a third party, and was not, therefore, a confidential communication. (3) There is no equity in plaintiff's case. The rule of construction of executed agreements to con-

vey land where possession is taken, the consideration
paid or valuable improvements made, has no applica-
tion to the construction of executory contracts. In one
case the court of law takes hold, while in the other a
court of equity must act and determine upon equitable
principles whether there is a just, reasonable and valid
contract, and it seems that in cases of this character
the presumptions arising from executed contracts in
courts of law are reversed in courts of equity. In
other words, before specific performance of an execu-
tory contract will be decreed, the court must be satis-
fied from the plaintiff's evidence that the contract is
a valid one, certain and definite in all its parts; that
it is fair and just and reasonable in all its terms and
requirements; that it is predicated upon a considera-
tion, and that it would not operate harshly or unjustly
upon others; and is then never granted as a matter of
absolute right in the party seeking it. Hollman v.
Canton, 143 Mo. 369; Durrell v. Hoak, 8 Mo. 374; South-
worth v. Hopkins, 11 Mo. 339; Taylor v. Williams, 45
Mo. 80; Veth v. Gierth, 92 Mo. 104; Fish v. Lighter, 44
Mo. 268; Paris v. Haley, 61 Mo. 453; Lease v. Foundry
Co., 141 Mo. 488; Doin v. Petty, 147 Mo. 374; Pomeroy
v. Fullerton, 131 Mo. 581. It will not be enforced upon
a consideration upon which the party could have a
remedy at law. Tucker v. Bartle, 85 Mo. 114; Willis
v. Gammill, 67 Mo. 735.

GANTT, J.—This is an appeal from a decree of
the circuit court of Pike county, dismissing plaintiff's
bill for specific performance of an alleged contract by
Mrs. Catherine Hedges in her lifetime to convey plain-
tiff 413 acres of land in Lincoln county in this State.
Mrs. Hedges died at her home, near Brevator, in Lin-
coln county, on the nineteenth day of February, 1899.
The plaintiff, Mrs. Lizzie Brevator, is the wife of John
Brevator, a son of Mrs. Catherine Hedges, by her first
husband, John Brevator. Mrs. Hedges died intestate,

leaving as her heirs-at-law, her son, John Brevator, the husband of plaintiff; Brevator Creech, the only son of a deceased daughter, Mrs. Collie Creech; and five minor children of another deceased daughter, Mrs. Annie Wise. The plaintiff's suit is against all those heirs-at-law. The defendant minors appear by guardians *ad litem*.

At the time of her death, Mrs. Hedges owned in her own right about 3,200 or 3,300 acres of land near Brevator Station in Lincoln county. The land had belonged to her husband, John Brevator, and had been deeded by him to her, to her sole and separate use. Mrs. Lizzie Brevator had been reared from childhood by Mrs. Hedges and her first husband, John Brevator, and was living with them when she married their son, John, about 1880.

Soon after plaintiff's marriage to John, he and she went to Jacksonville, Illinois, to live, but came back to the home place some time in 1881. In the spring of 1882, John put in a crop of corn and oats on his mother's farm, but before it fully matured, he left his home and went west, and the plaintiff with her three children went to live with his mother, Mrs. Hedges, with whom they continued to reside until 1893. In the meantime, one of these children died. In 1893, after an absence of some ten or eleven years, John returned to his mother's home and took his wife and two children to South Bend in the State of Washington. John and his family remained in the State of Washington until 1898.

During his long absence from 1882 to 1893 the evidence tends to show that John Brevator never wrote to his wife and children, or his mother, and for years they did not know whether he was dead or alive.

The evidence shows that in all his years of absence, John Brevator accumulated nothing and contributed in no way to the support of his wife and children with the exception of about $300 in 1883.

Thrown upon her own resources and the affection of her mother-in-law, and foster mother, Mrs. Lizzie Brevator and her children took up their abode with Mrs. Catherine Brevator. In that family the evidence shows that she met every requirement of a dutiful daughter. Indeed, she supplied the place of a maid-of-all-work. She washed, ironed, cooked and milked. On all occasions the mother-in-law spoke in the most grateful terms of the services rendered by her daughter-in-law and of the kindness and affection she had received from her in sickness, and of the sweet small daily ministrations which money could not purchase. On the other hand, Mrs. Catherine Brevator furnished a home and supported Mrs. Lizzie Brevator and her children and sent the children to school.

In 1885 Mrs. Catherine Brevator married Mr. O. P. Hedges, of St. Louis, and thereafter he and his unmarried daughter made their home with the family on the farm at Brevator, the daughter aiding in the household and kitchen work.

After John Brevator took his wife and children to South Bend, Washington, Mrs. Lizzie Brevator became the owner in her own name of a dwelling-house in that town. The record does not disclose from what source she derived the money with which she acquired this property. It is a fair and reasonable conclusion from all the evidence to say that John, her husband, had not furnished it.

The testimony shows that after John took his family away from Brevator in 1893, the loss of the society, assistance and filial services of Mrs. Lizzie Brevator weighed heavily upon the old mother and again and again she expressed her determination to get them back, offering them inducements to come and live on the old farm again, saying she intended to give Lizzie and the children the home place.

At and about this time, the plaintiff's evidence tends to show, the old lady had written to John and

offered him inducements to return and live on her farm, but had not heard from him. On or about the twenty-seventh day of June, 1897, Mr. Hedges, at the request of his wife, Mrs. Catherine Hedges, wrote Mrs. Lizzie Brevator, her daughter-in-law and plaintiff herein, the following letter:

"I am getting old, and want you and John near me while I live. Perhaps I have been a little hard on John, but I have done everything as I thought was best for both him and myself. I was always a little suspicious of John for fear he would squander everything that I would give him, but I will write him again before very long and propose to deed him a few hundred acres of land and give him a good start in hogs, horses and cattle, etc. Now, Lizzie, I want you to use your best influence to bring him home here, which I know you will do, and now I will tell you what I will do for you, for I am fully aware just how you feel about the many promises I have been making you for so many years while you stuck to me like a good daughter and got nothing in return, and so I feel it my duty to pay you for the many years you worked for me, outside of the money at so many different times I borrowed from you that you got from your father's and mother's estate. I also promised you some cattle, and in fact, you know I got Mr. Hedges to set apart for you a lot of cattle to help pay you for moneys you give me and for money due you from me, about the time John left here, at the time he was gone so long, and so when you left in the spring of 1893, I told you to leave the cattle with me, and that I would pay you in cash for the growth and increase of them, and that John must be kept in ignorance of all our dealings. And now, to show you that I mean to be fair and honest with you, that if you will persuade John to come home, I will pay you enough to make you more than satisfied for all your past services and for money, stock, etc. We have a large lot of live stock,

such as horses, cattle, sheep and hogs, etc., that I want to sell and then there will be an opening for John to farm on as large a scale as he would wish for and so I, therefore, promise to pay you at least $4,000 in cash within two years after you arrive back home in sum or sums as you will want and need from time to time for yourself and to furnish John money when necessary to buy things to stock the place I intend giving him. All this I want to be confidential between ourselves so that he will virtually know nothing about it.

"I will now also agree positively that at my death, you shall have my home place, which shall include the house in which I live, together with thirteen acres I got from Mrs. Joske and enough more land to make fully 400 acres more adjoining the Joske land on the east of said tract, and to widen out both north and south fully three-quarters of a mile and to make Bob's creek, which runs in an easterly direction, as the north boundary line. And then on the south of said tract, commencing at the sand ridge from Henry Wehde's line, and thence to run on a straight line east to make the required amount of 413 acres.

"Now, this land to you, Lizzie, together with the $4,000 cash, I think no more than a just recompense for all that you have done for me in the past years. I always intended that you should have this home with the land described outside and apart from anything else connected with my family.

"I tell you all this so that you will feel perfectly safe and feel satisfied about the matter. You have been a good and dutiful child to me, and I shall reward you accordingly.

"Now, keep all this to yourself and let me know as soon as you make arrangements for certain to come home.

"I will now close and hope this will find you all quite well. Trusting that you will soon write me that

you have decided to come home, I remain, with much love.        "Your affectionate mother,

"CATHERINE HEDGES."

Afterwards on the twenty-sixth of September, 1897, the plaintiff replied to that letter as follows:

"South Bend, Washington, Sept. 26, 1897.

"My Dear Ma:—I received your kind and welcome letter of June 22d, last, with great pleasure and read it carefully and am glad to say to you that I feel sure we will come home by next spring, as I feel certain that John will be be more than glad to come on the terms you propose to offer him. I can assure you that I will be perfectly satisfied to accept your kind proposition to me in paying me the $4,000 in cash within the time you say, two years, and the home with 400 acres will be a beautiful residence and farm, which I will keep for my children, as you often told me you wanted me to do.

"Hoping this will find you enjoying good health, as we are at present, and with much love and best wishes to all.        "Your loving daughter,

"LIZZIE A. BREVATOR."

Mr. Hedges testified that the circumstances attending the writing of the letter to plaintiff in June, 1897, were the following:

It was written on the table in the dining-room on the farm at Brevator by himself at the request of the old lady. She directed him first what she wanted written to her daughter-in-law. He wrote it and read it to her and she said it was all right. Nelligar, an old friend of her husband's who had been a member of the family for many years, was called in from the dining-room to hear the letter read and to give his advice upon it. He approved it and the letter according to Mr. Hedges was given by Mrs. Hedges to Nelligar to mail. Nelligar was the postmaster at this little station of Brevator. Nelligar testified he mailed the letter. An

envelope was offered in evidence bearing mailing date
of June 27, 1897. Nelligar does not himself say that
Mrs. Hedges handed him the letter to mail, nor that
after he had approved its contents, the old lady as-
sented to or indorsed the contents. Mrs. Hedges was
an illiterate woman, but she was shrewd, cautious and
possessed of much natural ability. The evidence estab-
lishes that owing to her illiteracy, her husband, Mr.
Hedges, attended to her business correspondence.

As a result of her letters to her son and the plain-
tiff, John Brevator, in the spring of 1898 did return
from the State of Washington to the old home at
Brevator. Before leaving South Bend, Mrs. Brevator,
the plaintiff, sold her home there, but for what sum or
whether at a profit or a loss nowhere appears. After
their return, John and his family were given a home
in what was known as the Club House on the Hedges
plantation. After his return, the evidence tends to
show that John requested his mother on different oc-
casions to fulfill her promise to convey him the land
which she had promised to give him. He also had
others intercede with her for him. Finally R. C. Mc-
Gruder saw her for him and suggested to her that she
could deed John a tract of land and provide that it
should be taken as an advancement of a portion of
what he should receive as an inheritance at her death.
This seems to have satisfied her and she expressed her
willingness to make him a deed. Matters, however, re-
mained in statu quo until February, 1899, when Mrs.
Hedges became seriously ill and her physicians deter-
mined upon an operation. When this became known
to John, he sent for a justice of the peace, and Mr.
Hedges saw the old lady and she directed a conveyance
to be drawn to a tract of 455 acres, including the Club
House. Accordingly the deed was drawn and executed
by the old lady. She submitted to the operation and
died a day or two later, on February 19, 1899.

At the October term, 1899, of the Lincoln County

Circuit Court, John Brevator commenced a suit for the partition of his mother's estate against Brevator Creech and the Wise children. An interlocutory decree was entered, appointing commissioners, and the decree provided that one-third of the whole real estate, including the 455 acres which had been conveyed to him, should be set off and assigned to John; one-third to Brevator Creech, and one-third to the Wise children. The commissioners, after devoting nearly a month to the work, made their report at the spring term, 1900, of the circuit court, giving to John the home place, including the land involved in this suit and other lands lying east, which, together with the 455 acres, amounted to over 1,000 acres of land. John Brevator filed objections to the commissioners' report, and at this point, the original petition in behalf of plaintiff was filed in this suit, to-wit, April 11, 1900.

The evidence further shows that prior to his mother's death John and his family moved into the house with his mother and were residing there as members of her family when she died.

During their work, the commissioners in partition boarded at the Hedges home. Mrs. Lizzie Brevator knew they were engaged in dividing all of the lands among the heirs. No claim was advanced by her that she was entitled to any portion of it in her own right so far as the defendants were advised until this action was commenced.

After hearing the evidence, the circuit court dismissed Mrs. Lizzie Brevator's bill, and she appeals.

I.  Conceding, for the purpose of argument, that the letter of June 27, 1897, was written by O. P. Hedges at the instance of and by the request of Mrs. Catherine Hedges to the plaintiff, her daughter-in-law, and that it was Mrs. Hedges's letter, and that pursuant to the inducements held out John Brevator and his family returned to his mother's home in Missouri, will the facts

of this case demand a decree vesting the 413 acres, the subject of this suit, in Mrs. Lizzie Brevator, the plaintiff?

The groundwork of this suit is found in the allegation of plaintiff that after receiving the letter of Mrs. Hedges in June, 1897, "she immediately went to work in compliance with the terms of said agreement and induced her husband, John Brevator, who was then living in the State of Washington and holding a lucrative·position, to consent to return to Brevator, Missouri, with his family and make his home on the farm of his mother, Catherine Hedges, and that she consented to return with him, and in fact at a great loss and expense to themselves they broke up their home in South Bend, Washington, and returned to Brevator, Missouri."

In the foregoing paragraph must be found the equity which would justify a decree of specific performance of the agreement to convey plaintiff this 413 acres of land.

In saying this we are not unmindful of the admissions in said letter, that Mrs. Lizzie Brevator had in the past been an exceeding dutiful daughter to Mrs. Hedges, in ministering to her in sickness, and in laboring to keep the household affairs of the old lady in proper shape, and that from time to time the daughter-in-law had loaned her mother-in-law certain moneys, and that certain cattle had been set apart by the old lady in part payment of said indebtedness, and that these cattle had been left with the old lady under an agreement by her to pay Mrs. Lizzie Brevator in cash for the growth and increase.

So far as these services rendered and moneys loaned are to be taken into account, they were matters wholly in the past, and there is no evidence that the consideration for them was a promise by Mrs. Hedges to convey the lands in suit or any other lands to her daughter-in-law, even though it be conceded that said

services and moneys were rendered and loaned, not as a gratuity, but with the distinct understanding that they were to be remunerated for by the old lady. For them, she had her plain action at law.

When we come to the promise to convey the land, there is no requirement that the plaintiff is to render any future services, but the whole tenor of the letter is that the land with the $4,000 is to be in satisfaction of the services already rendered, or that the land is to be a gift from the old mother to the daughter.

If the latter, obviously a bill in equity does not lie to enforce the performance of a voluntary promise of a gift. If the letter is to be understood as a promise to pay $4,000 and convey the 413 acres of land in satisfaction of a past due indebtedness, the right of action is on the debt itself, at law, which in view of the unquestioned solvency of Mrs. Hedges would have afforded a perfect remedy. If, then, there is any equity in the bill, it is found in the averment that, relying upon the old lady's promise to convey her the land, Mrs. Lizzie Brevator did induce her husband to give up a lucrative position, sacrificed her property in South Bend, and came to Missouri, and to permit the old lady to refuse to comply with her promise would work a fraud upon plaintiff, and, therefore, she is entitled to a specific performance of the promise.

Looking now at the allegation that plaintiff went to work and induced her husband, John Brevator, who was then holding a lucrative position in South Bend, Washington, to consent to return to his mother's home and plaintiff consented to return with him, and at great loss and expense they broke up their home at South Bend, and returned to Missouri. As a matter of fact, the overwhelming testimony is that John Brevator did not have a lucrative business. He was in debt and out of employment. There is no evidence that Mrs. Brevator sold her home at a sacrifice or loss. There was evidence that his mother sent John the money on

which he brought his family back to Missouri. There is ample evidence that Mrs. Lizzie Brevator's position in life was much improved by the return to the old mother's home. They were at once installed in a house free of rent and in less than a year the mother had taken them again under her own roof and made a deed to John to 455 acres of land. Not a single day's service was required of plaintiff or her family for Mrs. Hedges after their return. In compensation for a home consisting of 455 acres of valuable land and the expense of bringing them home, plaintiff was required to do nothing at all, but was allowed to retain the moneys for which she sold her home and property in South Bend. Instead of suffering injury by complying with the old mother's request to return to her home, plaintiff and her husband were benefited in every way. For the promise, Mrs. Lizzie Brevator, the plaintiff, assumed no liability, undertook to perform no new services, and sustained no loss by reason of the promise of Mrs. Hedges.

More than this, there was evidence tending to prove that John brought his family home on account of the letters his mother wrote him, and it is very significant that this claim was never made until after the commissioners had made their report assigning this very land to John Brevator.

This action is against minor defendants. The circuit court was bound to keep their rights in view and that the decree sought in this case would operate most harshly against these minors and deprive them of a large part of their inheritance. A specific performance of a contract is not a matter of course, and while the discretion of the chancellor must be a sound judicial one and not a mere arbitrary or capricious refusal of relief, we find nothing arbitrary in the refusal of the learned circuit court in denying the relief sought in this case. It will serve no beneficial purpose to review the cases in which such a performance has been decreed

by this court. In our opinion, the facts of this case do not bring it within the principle of any of the decided cases in this jurisdiction.

As we have reached this conclusion upon the most favorable aspect of plaintiff's case, we have not deemed it necessary to express an opinion upon competency of the evidence by which the letter was established, nor upon the sufficiency of the description of the land.

The judgment of the circuit court is affirmed.

All concur.