MARY SMITH ET AL. V. EDNA LORE, Appellant.—29 S. W. (2d) 91.

Division One, June 3, 1930.

*Jayne, Jayne & Jayne* for appellant.

*J. E. Rieger* and *J. E. Luther* for respondent.

ELLISON, C.—The petition is to determine title and for partition of a lot in Kirksville, Adair County, 160 acres of farm land in Knox County and 360 acres of farm land in Scotland County. The plaintiffs are the heirs of Julia Lore, deceased, being her brother, three sisters, and three sets of nephews and nieces who are children of three deceased brothers. The defendant, Edna Lore, is the widow of Madison Lore, or "M" as he is called in the record, only child of the said Julia Lore. He predeceased her, intestate, in November, 1918, leaving no lineal descendants. His father had died theretofore, so his mother, Julia, was his sole heir under Section 332, Revised Statutes 1909, subject to the dower rights of the defendant Edna; and when Julia thereafter died in January, 1926, her collateral kin, aforesaid, became her heirs.

M. Lore died owning the lot in Kirksville, the 160 acres in Knox County and 200 acres of land in Scotland County. The remaining 160 acres in that county was owned by him and his mother together, each having an undivided half interest. So the plaintiffs claim all the land above mentioned by inheritance from Julia Lore, but concede to the defendant Edna a dower interest in all of it except the half interest in the Scotland County 160 acres which did not belong to Madison. There was no adminis-

tration on Madison's estate, and at the time this suit was filed Edna had not elected to take a half interest in his real and personal estate under Sections 321 and 323, Revised Statutes 1919.

The answer of Edna Lore adversely claimed the whole title to all the land involved except the half interest in the 160 acres in Scotland County which Julia had owned. This, it was conceded, belonged to the plaintiffs as heirs of Julia.

The basis of the defendant Edna's claim is this. She alleges that when Madison died he and his mother, Julia, were partners in farming and stock raising on the 520 acres of land which figures in this case, and about 280 acres of other land not involved herein which belonged to Julia alone. It is Edna's pleaded contention that upon the death of her husband, Madison, she was preparing to return to her parental home, when Julia proposed to her that if she would remain and continue the aforesaid partnership arrangement, she (Julia) would give her (Edna) all the real and personal property Madison owned when he died. In other words, Edna was to step into Madison's shoes and have the same interest in the partnership and the land used by the partnership and the Kirksville lot that he had owned.

The answer charges that the foregoing contract was fully carried out by both parties up to the death of Julia, except that Julia, through neglect or oversight, failed to convey Madison's land to Edna by deed or will; and it is therefore prayed that the agreement be specifically enforced against Julia's heirs, the plaintiffs. As to the 160 acres of land in Scotland County in which Madison had only an undivided half interest, and in which the plaintiffs inherited the other half interest, the answer joins in praying partition of that tract—but in accordance with Edna's alleged rights under her contract. A further claim was made in the answer that Madison advanced $1200 of the purchase price of Julia's half interest in this 160 acres, and a lien against the same was prayed accordingly; but that claim was not sustained by proof and was abandoned, we may say, so we shall not refer to it again.

By their reply the plaintiffs denied the contract set up in the answer, and pleaded the Statute of Frauds. The court found the issues for the plaintiffs and adjudged Edna Lore's only intereest to be a dower with a right to elect to take a one-half share in fee in lieu of dower, under the statutes. Subject to this dower right the title was decreed in the plaintiffs and partition was ordered in accordance with their interests as heirs of Julia. This decree was entered on December 31, 1926, and by the terms thereof the defendant Edna was required to exercise her option to take election dower by February 21, 1927. Under coercion of this order she did elect to take a half interest in fee within the time fixed, and the court thereupon made a further order appointing com-

missioners to set out the dower interest and partition the remainder. From this interlocutory decree the defendant Edna has appealed.

As the case is submitted here, practically the only question for decision is whether the oral contract pleaded and relied on by the appellant Edna Lore was sufficiently established by the evidence. Indeed we may go further and say there is no controversy about the fact that Julia Lore, deceased, and Edna Lore did enter into *some* contract whereby the partnership arrangement theretofore existing between Julia and Madison was continued after Madison's death with Edna as his successor in the enterprise. Under the contract she succeeded to his interest in the partnership personalty —there is no doubt about that. The only question is whether she got, as well, the real estate he owned.

The fact is abundantly established that when Madison died the partnership owed notes at the bank amounting to over $7,000. There was sufficient livestock on hand, mostly cattle, to meet this indebtedness, and it was later paid off, but it took hard work on the farm to do it and to keep the business going. The record shows without contradiction that for seven or eight years between 1918 and 1926 Edna, and Julia too, for that matter, toiled like a slave. She waded in the mud in gum boots feeding hogs and cattle. The evidence is that she assisted in dehorning cattle; treating steers that had been dehorned; put caustic medicine on steers that had the lump jaw; mended harness; and on one occasion pulled, or attempted to pull, a cow out of the mud with wagon and team.

So, with clear and satisfying proof that there was some kind of a partnership contract between Julia and Edna which was fully performed by Edna, under which she got Madison's personalty, we shall examine the evidence with a view to ascertaining what the terms of the contract were, and whether it entitled her to Madison's real estate also. The plaintiffs did not put on any evidence to disprove the contract. They contend simply that the showing made by the appellant Edna was insufficient. Edna was incompetent as a witness on the main questions at issue, under Section 5410, Revised Statutes 1919, because Julia, the other party to the alleged contract was dead. She was used only to identify certain partnership book accounts.

H. T. Drake was county assessor in 1919. He assessed the property of Julia and Edna Lore. Julia told him they were carrying on the partnership just the same as it had been and that Edna was taking Madison's share. His property belonged to her. Madison had died in November, 1918, not long theretofore. The witness was asked if he assessed their land and ascertained whether there was any change in ownership. His answer was in the affirmative, and the inference is that he meant to say Edna was getting Madison's land as well as his personal property, though

the witness's testimony on this point is not as clear as it might be.

George W. Rudy assessed the partnership in 1920. The two women told him they were partners and made out a partnership list. The testimony of this witness does not disclose whether the real estate in controversy was expressly mentioned in this conversation, but tax receipts introduced in evidence showing the taxes on the land paid in 1921, 1922 and 1925 were assessed to Julia and Edna jointly and were paid by the partnership.

Charles Shumate was Deputy U. S. Internal Revenue Collector in 1919. He called on the two Lore women to check over a return made for the year 1918. He learned of Madison's death and suggested a return should be made for the deceased. Julia Lore declared she didn't think it was necessary, saying, "Edna has stepped in his shoes and we are doing business just as though he were here."

Lester Kaser was an old friend and schoolmate of Madison's and had known Julia and Edna Lore a long while. He said Julia told him she and Edna were "together on the stock" but he didn't know about the land. The evening she took sick of her last illness she sent for him. She wanted to talk business. She said she was hard up, but that her affairs would be fixed so there would be no fighting over her property after she died. She also said she didn't want any of her folks called if she got sick, and told him several times they were after all she had.

J. J. Honan, a banker at Edina, said before Madison's death the bank account of the farming enterprise conducted by Madison and his mother was carried in his name. Afterward it ran in the name of both Julia and Edna Lore. Julia told him Edna took up Madison's part of the partnership. There were equal shares in the livestock and everything on the place except probably some of the machinery Madison owned. The witness was not asked about the real estate.

Emery Ashby sold Julia and Edna a Ford sedan in 1922. Julia told him they were partners and that Edna had as much to say about buying the car as she did. She said since Madison had died Edna was her nearest relative and seemed as near to her as her son had. As to the land and personal property she declared she didn't want any of Madison's part at all; that she had turned that over to Edna and they were partners. On cross-examination he testified Julia mentioned the land in her conversation and said she had turned Madison's estate over to Edna.

J. T. Salisbury negotiated with Julia and Edna about putting some fire insurance on buildings located on land used by the partnership. Some question came up about the amount of the insurance and the value of the buildings. Julia said to Edna: "Well, you

have just as much say as I have, you are interested as much as I am." The insurance was made out to and paid for by the partnership, but it is not clear that the buildings, or a part of them, were on the land involved in this suit. There is some evidence indicating a part of the improvements covered were on land owned by Julia Lore alone.

Hobart Purvis worked as a farm hand for Julia and Edna Lore nearly two years in 1924 and 1925. Julia Lore said she and Edna were partners, and that when Madison died she turned his part of the property over to Edna. She said she needed somebody to stay with her and couldn't get along very well without Edna. On cross-examination he said Edna was absent from the farms, in Marceline, about six weeks in 1924 and about two months in 1925.

Verne Phillips was a farm hand. He worked for the Lore partnership off and on for three years and lived in their home. Being asked if he knew who owned the land he said Julia told him "the property all of it was half hers and half Edna's." And again that Edna "had land there and she had a right to stay there and half the stock was hers and half of it was Edna's." Further on he quoted Julia as saying: "The land that M. and Edna had bought she wanted Edna to have it; that was hers. When her man died she got her part of that and when she died she wanted to see Edna get M.'s." She also said "she thought she had things fixed so they would go the way she wanted them to," and that "she hoped some didn't get it that thought they was going to get it, but she thought she had it fixed so they wouldn't."

On cross-examination plaintiffs' counsel asked the witness if he knew that when Julia's husband (Madison's father) died she only got a half of his property. The witness answered "Only what Mrs. Lore told me." He was then asked: "She told you she wanted Edna treated just like she was treated in that marriage?" He answered, "Yes, she wanted Edna to have M's part." And counsel added, "And be treated just like she was?" and the witness answered, "Yes, sir."

Later on this witness Verne Phillips was recalled. On redirect and re-cross-examination, he said Julia Lore asked him to stay to dinner one day, and while there she told him about one of her brothers who had died and how he left his estate. Julia said: "I think I have got mine fixed that way, so the one I want to get it will get it and nobody can bother it and I hope that Edna gets all of M's part." The witness said he told her that might cause trouble, and she said, "I don't care if there is. I think they will stay with them and get it." It was brought out by counsel for respondents that since his former appearance on the stand the witness had talked to counsel for appellant, and he was vigorously assailed for having failed to tell the same story in the beginning.

Jud Phillips went to see Julia Lore after Madison died about buying some timber Madison had promised to let him have. Julia told him she and Edna were going to be partners and run the place the same as M. had always run it. They were equal owners of the stock and Edna was to get the land M. had. "When the old man died she got everything there and she thought it was right for Edna to have that." On cross-examination the witness said he got the timber he went to buy and paid $8 for it. The partnership bank account shows a credit of $8 from I. L. Phillips on December 31, 1918.

O. J. Rhodes went to see Julia Lore about some insurance. He was a notary public and a "jacklegged lawyer," he testified, and Julia asked him if he would draw her will. She told him how she wanted her property to go and he, fearing the instrument would be too complicated, referred her to a lawyer in Edina. In talking to him she shed tears about M's dying without an heir and said they had set their hearts on getting together 1500 acres. She told where their land was and which part was hers and which M's. She said "she wanted Edna to have all of M's part of the estate." As we understand the witness she proposed to leave one sister one dollar, some land in Scotland County to two others, and forty acres to the county for a cemetery. There was no cross-examination of this witness.

Leo Bachman worked for the two Lore women for about one and one-half years in 1923 and 1924. One day in 1923 while it was raining he went in the house. Julia told him when M. died she and Edna were $7,000 in debt, but they had some cattle and hogs on feed and borrowed money at the Edina Bank and paid it out. She said "she wanted Edna to have M's part and all that her and Edna made together while they was working together." She also said when M. died "she told Edna if she would stay and help her they would go on and do just like her and M. was doing."

Mrs. Dora Pierce testified that Julia Lore told her time and again she didn't want any of her three sisters called to see her until she was dead "and that was soon enough." She didn't say why.

Mrs. Minnie Mallory said Julia Lore told her she loved Edna Lore better ever day she lived with her. She did not disclose how she felt toward her sisters except to say "she didn't want her folks to have what she had." She said this several times, the last time not long before she died. Once she said she wanted it to go to an orphan's home. This also was only a few months before she died.

J. M. Jayne, a lawyer in the practice some twenty-eight years at the time of the trial, was a witness for appellant. He was also

one of the attorneys for appellant in this case, and in answer to questions on cross-examination said he was employed partly on a contingent fee. She came to consult him about making a deed conveying some land to the county for a cemetery. In the course of the conversation she asked him about giving property to an orphans' home. She said "when M. died I told Edna if she would stay with me I would give her M.'s part and the rest of it I want to give some of it to an orphans' home." This was in October, 1924.

Later she came to him again about giving property to an orphans' home. He told her she could either will it or deed it. She said her private papers were in Kirksville and she would go there and have it done, and then she stated "she had arranged to give Edna M.'s part and that was fixed and she wanted to deed this other." She said she had some Government bonds and some property in Kirksville and some money loaned out. The papers were in her box there.

By stipulation between counsel it was agreed that if a certain Mrs. Pruitt were present she would testify "that she and her husband lived on the farm operated by Julia Lore and her son M. Lore for about four years; that they were living on that farm at the time M. Lore died; that her husband died shortly after M. Lore died; that in a conversation which she had with Mrs. Julia Lore, Mrs. Julia Lore told her that she had agreed with Edna Lore that if she, Edna Lore, would stay on the farm with her and help her run the farm she would give Edna Lore all the property that M. Lore owned at the time he died, and that they would farm and continue a partnership of that farm and farm business."

The partnership income tax return of Julia and Edna Lore to the U. S. Department of Internal Revenue for the year 1922 was introduced in evidence, along with the accompanying schedule of farm income and expenses; also the individual income tax returns of Julia and Edna Lore, respectively, for that same year. These showed the net income from the partnership farming operations amounted to $2760.36, of which Julia got half, or $1380.18, and Edna half. In addition Edna showed she had individually paid $62.33 taxes on a Kirksville residence property, which was unrented, and that she had received $12.75 interest on Liberty Bonds. In her separate return Julia showed no taxes paid and $297.50 interest received on Liberty Bonds. Their partnership return and farm schedule for the year 1923 showed a net loss of over $650.

Finally, certain letters which were writteen by Julia Lore to Edna Lore and the latter's mother, Mrs. Turner, were put in the record. The first of these was dated November 9, 1924. In it Julia Lore said (underscoring "ours") :

"I got a letter from Dr Walker he want to know what would he my best price on that 200 acres of land he said his land was all

for sale. I will write him & Tell him I will give him $30.00 per acre in cash providing he gave *us* a warntee deed with abstrack for the 80 acres that lays here by *our* land. I would do a little better if I could get it but dont look for anything I will see what he said about it that is the poorest land he has.''

In her next letter, dated November 19, 1924, answering one received the night before, and again referring to the Walker land transaction, Mrs. Lore said:

''I wrote to Walker he never answered me. Of course if *we* got that land from him *we* would see about the abstract & all the rest of the acount yes If I get on a deal with him I would want you to come & *we* would go & see about the title.''

There were four other letters written between September 29 and December 13, 1925. They discussed family matters and gave neighborhood gossip, talk about the management of the farm and the handling, purchase and sale of live stock and poultry, the making out of income tax reports, etc. In one of the letters, dated November 18, 1925, Julia Lore says: ''Charley & Lena was here tonight we was making sign to put up to keep the hunters & trapeing out of *our* farms.'' All of the letters indicate an affectionate regard for Edna and many times the wish is expressed that she and her mother, Mrs. Turner, would come back soon or that they were there on the Lore farm to have some of the good things to eat that were going on the table.

I. So much for the evidence. Respondents invoke the rule often declared by this court that when a litigant seeks to enforce specific performance of an oral contract to convey land in the teeth of the Statute of Frauds, he will be held to clear and convincing proof therefor and the agreement must be explicit and supported by an adequate consideration. It is unnecessary to restate the doctrine here. The several canons thereof are set out in Walker v. Bohannan, 243 Mo. 119, 136, 147 S. W. 1024, 1028, and in other decisions before and since.

But while true specific performance cases are rare, as the Walker-Bohannan case says, we are driven to the conclusion that this is one of them. In our opinion the contract pleaded and proven was sufficiently definite. It was that if Edna would become Madison's successor in the farming partnership theretofore existing between him and Julia, the latter would give Edna the real and personal property left by Madison. This was certainly explicit enough. To be definite it does not always follow that a contract must be detailed. We think, moreover, the agreement was conscionable, supported by an adequate consideration, and that the full performance shown was referable to the contract.

All this is in effect conceded, or at least not seriously disputed. The real question in the case is whether there was sufficient proof to establish clearly that Edna Lore was to get Madison Lore's land under the contract, and not merely his personal property. It was on that point that the learned Chancellor ruled the case for respondents, but after a review of the whole record we have come to a contrary view.

Without reviewing the evidence extensively, again we need only say the testimony of H. T. Drake, Emery Ashby, Hobart Purvis, Verne Phillips, Jud Phillips, O. J. Rhodes, Leo Bachman, J. M. Jayne and Mrs. Pruitt, and the letters introduced, all clearly show Julia Lore considered Edna Lore had an interest in the Lore land or was to get an interest at her (Julia's) death; and most of this evidence is that the part Edna had or was to receive was the land Madison had owned. If the proof on this point went no further than to disclose a testamentary inclination on Julia's part arising out of affection or a sense of gratitude or moral obligation, it would be insufficient to make a case.

But the evidence is not thus limited in its scope and effect. Along with clear proof that there was a partnership contract under which Edna did get Madison's personal property, and satisfying proof that Julia loved Edna and intended her to have Madison's land and did not want her own heirs to have it, there is further testimony yoking these two sets of facts together and showing that Edna got or was to get the land under and as a part of the partnership agreement.

Julia told Emery Ashby she had turned M.'s part of the land and personal property over to Edna and in the same breath stated they were partners. To Hobart Purvis she said she and Edna were partners and that when M. died she turned his part of the property over to Edna. Her statement to Jud Phillips was that she and Edna were going to be partners and run the place the same as M. had always run it. Edna was to get everything that belonged to M., including his part of the land, and they were going together and work together. Leo Bachman quoted Julia as saying she wanted Edna to have M.'s part, and added "she also said when M. died she told Edna if she would stay and help her they would go on and do just like her and M. was doing." J. M. Jayne testified that in consulting him as an attorney about another matter Julia said: "When M. died I told Edna if she would stay with me I would give her M.'s part;" and by stipulation of counsel it was agreed that if Mrs. Pruitt were present she would testify Julia told her she (Julia) had agreed with Edna that if Edna would stay on the farm and help run it she would give her all the property M. owned when he died.

It is perhaps true that out of all of these witnesses only the two last mentioned, Mr. Jayne and Mrs. Pruitt, really can be said to have testified categorically that Edna Lore became entitled to the land under a *contractual* arrangement. But the fact that there were only two witnesses on this point out of a considerably greater number, all told, does not of itself signify the evidence was not substantial and adequate. Indeed, this court has said the testimony of even one witness may be sufficient to establish an oral contract for the conveyance of land against the Statute of Frauds, if his story is clear and convincing. [Merrill v. Thompson, 252 Mo. 714, 728, 161 S. W. 674, 678.] The testimony of the two witnesses in the instant cause was of that character, we think, and is strongly corroborated by the other evidence. It is true, also, that neither Mr. Jayne nor Mrs. Pruitt testified in terms Edna Lore was to get M.'s *land* under the contract. To Mr. Jayne Julia said she was to give Edna "M.'s part," but from the rest of the conversation it is apparent this referred to his land; to Mrs. Pruitt she said she had agreed to give Edna "all the property M. owned when he died." This necessarily included his land. To our minds the proof is satisfying, taken altogether.

II. But respondents make the further point that the able chancellor who tried this case below found the other way, and it is said deference should be accorded to his findings. Such is the unquestioned rule in Missouri—though of course in equity cases this court is not bound by the conclusions of the trial court—but the rule is applied mainly when the oral evidence is conflicting. [Reaves v. Pierce, 26 S. W. (2d) 611.] The evidence here is not conflicting. The respondents introduced no evidence. We can see how the witnesses on one side of a case might contradict each other, or how the trial judge might have an advantage in passing on their credibility from the fact that he was present and saw and heard them testify, even though they were all for one party and there was no countervailing evidence. But, in one respect we have an advantage over the trial court in that we can view all the evidence in perspective from the printed record, and read, re-read and retain before the eye and mind for comparison the various parts of each witness's testimony and that of each witness with the others. This method of examination has led us to the conclusion above stated.

III. Respondents make objection to appellant's abstract of the record. They say it shows the witness J. M. Jayne testifying Julia

294

told him "she had arranged to give Edna *M.'s part*," whereas the bill of exceptions says "she had arranged to give Edna *this money.*" (Italics ours.) Appellant in a reply brief insists the bill is correctly copied in her abstract and suggests that if the matter be in doubt the original bill of exceptions be brought up from the Circuit Court of Knox County. But we think this is unnecessary. The statement made by respondents challenging the appellant's abstract appears only in a part of their brief entitled, "Brief and Argument on Insufficient Abstract of the Record." They did not prepare and serve an additional abstract of the record as required by Rule 11 of this court. In these circumstances it is our duty to take the appellant's present abstract as submitted.

For the reasons given the cause is reversed and remanded with directions to the Circuit Court of Knox County to enter its judgment and decree specifically enforcing the contract set out in the appellant's answer vesting in the appellant Edna Lore the fee simple title to all the land described in the plaintiffs' petition and in the appellant's answer except the west half of the southeast quarter and the northeast fourth of the southwest quarter, all in Section Twenty-nine (29), and the northwest fourth of the northeast quarter of Section Thirty-two (32), all in Township Sixty-four (64), Range Twelve (12) west, Scotland County, Missouri; that as to the 160 acres last described the decree vest in the appellant Edna Lore an undivided one-half interest and in the heirs of Julia Lore, deceased, the remaining undivided half interest; and for such further proceedings in partition as are not in conflict herewith. *Lindsay* and *Seddon, CC.*, concur.

PER CURIAM:—The foregoing opinion by ELLISON, C., is adopted as the opinion of the court. All of the judges concur.