Russell O. BEALMEAR, Appellant,

v.

Claude R. BEESON et al., Respondents.

No. 22582.

Kansas City Court of Appeals.

Missouri.

June 3, 1957.

James Glenn, Macon, L. F. Cottey, Lancaster, for appellant.

Jayne & Jayne, Kirksville, Hess & Collins, Macon, for respondents.

BROADDUS, Presiding Judge.

This is a suit for specific performance of an alleged oral contract whereby the late Alfred L. Bealmear agreed to leave his son, Russell O. Bealmear, his entire estate at his death. Instead, he left a will disinheriting his son. The first Count of the petition, to contest that will, was dismissed. Trial of the issues on Count II in the Circuit Court resulted in a decree adverse to the son, from which he prosecutes this appeal. Jurisdiction rests with this court on the basis of the stipulated fact that the deceased left no real estate and the value of the personal estate was less than $7,500.

This is the second time the case has come to us. On the prior appeal the question presented was whether or not Count II of the petition stated a cause of action. We held that it did. Bealmear v. Beeson, Mo. App., 263 S.W.2d 472.

Respondents have filed a motion to dismiss this appeal. It is based upon the claim that appellant has failed to comply with 42 V.A.M.S. Rule 1.08 of the Supreme Court in that Point 1 in his brief is merely an abstract statement of law without showing how it is related to any action or ruling of the trial court. This, however, is an equity suit and presents but a single question, so, in line with the holding of our Supreme Court in the case of Milanko v. Austin, 362 Mo. 357, 241 S.W.2d 881, 882, we overrule the motion.

In 1890, when Alfred L. Bealmear was twenty-seven years of age, he came to the little town of Prentice, Illinois, and met, and the following year married a girl named Elizabeth Davis. Apparently unemployed at the time, he lived with his bride for a while in her father's home, moved thence to Ashland, thence to Tulula, thence back to Prentice, all in the space of three years. During that period he worked as a coal miner, a sawmill hand, and a threshing machine operator. In Prentice on the last occasion, in 1893, the young couple became the parents of a son, Russell O. Bealmear, the appellant in this case. After a year of parenthood, for no disclosed reason Alfred Bealmear deserted his wife and child and drifted away to unknown parts, and for the next thirty years there was no word from him and no knowledge of his whereabouts.

More to the point, there was no knowledge on appellant's part that such a person as Alfred L. Bealmear had ever existed. In 1895, following her separation from Bealmear, Elizabeth married one Charles J. Baxter and thereafter lived with him as his wife, first in Prentice and later in Joliet, until her death in 1921. Presumably embittered by her treatment at the hands of Bealmear, she steadfastly refrained for the rest of her life from mentioning her marriage to him to her son, and brought him up in the unquestioning belief that he was the child of her marriage to Baxter. As a boy he was enrolled and attended school as Russell O. Baxter, received his certificate of graduation in the name of Russell O. Baxter, lived altogether under

the name of Russell O. Baxter. He considered Charles J. Baxter to be his father and treated him as such, and had no knowledge that his real father was Alfred Bealmear. As a young man he married under the name of Russell O. Baxter and became the father of two girls who were baptized and enrolled in church and school under the surname Baxter. One of his daughters died and he buried her under the name of ⸢Baxter. His wife and surviving daughter continued to be known by the name Baxter; he obtained employment as a railroad conductor under the name Baxter; in all of their business and social relationships the family was known only by the name Baxter. In fact, until the month of October, 1924, the family had never heard the name Bealmear. About the middle of that month, however, they received a letter that was to change the whole pattern of their lives.

The intervening thirty years had had their ups and downs for Alfred Bealmear. In that time he had remarried, his wife had died, and he had accumulated a little property in Oklahoma where he was living with a stepson. He was now sixty years old, in failing health, concerned with the disposition of his estate; and in that state of health and mind his thoughts turned to the son and heir he had deserted so long ago. Over a period of several months, with the aid of friends in Prentice, he located appellant, learned he was living in Joliet under the name of Russell O. Baxter, and wrote him this letter:

"Mr. R. O. Baxter, 1114 Burton St. Joliet, Ill. Dear Sir: I have written you once and got no answer then I sent you a register and it come back unclaimed but since I have found out that you don't know your right name which is Russell Owen Bealmer and I am your father and I can tell you your age You was 31 the 9th of Febuary and I was at the bedside when you was born. I was legaly married to your mother and we seperated in August 1894 and I have just saw you

once since that time. Now that I wanted to dispose of some property and do it legaly I am trying to find my boy Now if Charley Baxter has trained you or taught you that your name is Baxter he is doing you an injustice but if he has adopted you that is all right but you cannot share my estate in Baxter's name, so I would like to hear from you by return mail, if not I will cut you out of the estate.

"Yours truly
A. L. Bealmear."

It may reasonably be inferred that the news that he was not the child of Charles J. Baxter but was in truth the son of an unknown stranger came as something of a shock to both the appellant and his wife, with whom he discussed that letter and those that followed. Appellant replied promptly, requesting further details, and the father's exuberance was such that before the end of the month he had written approximately four times, addressing him as "Dear Boy" and "My Dear Russell", urging him to come to Oklahoma immediately for a visit, giving him the corroborative information establishing his true identity, and warning him of meddlers who might try to sow discord between them. In one of these letters this appears: "Yes, Russell, I have often thought that I would try to find you but just put it off from time to time and the years got to sliping very fast and I always wanted to have every thing in shape to die honerble and leave nothing in a tangle so that when the come it would be forever to late. So now I am 60 and I am prety well broke down. Knowing that life is uncertain and death is shure I am trying to make up for lost time."

In another letter this language is found: "Yes, I have thought of you many thousands of times, and since I refused to be defeated I think of you most all the time and I must see you in the near future and see if I can get the strain off my mind as I am carring a load at present."

In response to those letters appellant went out to Oklahoma the following month to get acquainted with his father, and remained there with him for something like four months. Then in the summer of 1926 the father came to Joliet to return the visit and stayed at appellant's home through the months of June, July and part of August. It was at that time appellant claims that the alleged contract in issue in this case was made. The evidence shows that appellant had continued to use and be known by the name of Baxter, though it was now nearly two years since he had learned his paternity. On this visit the father became insistent that his son adopt the paternal surname Bealmear and drop the name of Baxter. According to appellant's wife, "Dad said, 'Now, son, if you will just change your name from Baxter to Bealmear and treat me as your father, I will give you all I have at my death'. And, "my husband said yes, he would."

On the score of changing his name, appellant offered the following evidence:

He promptly discontinued the use of the name Baxter, assumed for himself and his family the name Bealmear, and he and they have since continuously used and been known by that surname. He immediately pulled up his roots in Joliet, broke his ties with the past, and moved to Chicago to obtain employment under his new name. He was listed in the Chicago telephone directory under the name Bealmear, his paychecks were issued to him in the name of Bealmear and so endorsed by him. He was known to his new acquaintances only by the name of Bealmear, his insurance policies were changed to reflect the change in his name and that of his wife as his beneficiary, his mail was addressed to and received by him under the name Bealmear, his taxes were assessed and paid in the name Bealmear, his Social Security card was issued to him in the name Bealmear, he obtained membership in a number of clubs under the name Bealmear. His wife and daughter likewise assumed the surname Bealmear and have used it exclusively since 1926.

Touching his recognition and acceptance of Alfred L. Bealmear as his father, and his filial treatment of him thereafter, appellant offered the following evidence: At the conclusion of the old man's visit to Joliet in the summer of 1926, appellant allowed his wife to accompany his father back to Oklahoma for a visit of several weeks, in the course of which the old man introduced her to a number of his relatives. In the ensuing years appellant, usually accompanied by his wife, made a number of visits to his father's home in Oklahoma and, as long as his health permitted, the old man came back to visit in his son's home, usually staying through the summer months there. And when the old man lay dying of cancer in an Oklahoma hospital, eleven days short of his eighty-fifth birthday, it was appellant and his wife who were at his bedside until the end came. From the date of his father's first visit in 1926 until his death in 1949, appellant wrote him regularly every month or oftener, invariably addressing him as "Dad", and such of the old man's replies as are available were addressed "My Dear Boy Russell," "Dear Boy and Family" and "Dear Kids." "He wrote his father lots of letters and was nice to him in the letters." When they were together, appellant and his wife addressed his father as "Dad", their daughter called him "Grandpa". The feeling between the father and his son, until shortly before the old man's death, was "always friendly;" the father "was very foolish about him, thought lots of him." It was evident the son "respected" him and treated him "like a father," and the father reciprocated by saying "everything good" about his son.

The evidence disclosed that Alfred Bealmear had made his original proposition to appellant in the presence of appellant's wife, her mother and her sister, and had repeated it on various occasions during his first visit in their home. On his return to

Oklahoma with appellant's wife he made an allusion to the contract; he showed her a farm and filling station property he claimed to own and told her it would one day be "yours". On that same occasion he took her to visit his niece and her family and to them then, and at various times thereafter, he described his agreement with his son and told them he had "agreed to will him all I have." There is no evidence that he was ever in doubt as to the fact of his contract or its terms, there is nothing to indicate that he was dissatisfied with appellant's performance of it. However, in the late years of his life, "from '45 on," when he was past eighty and in declining health, he brought this chapter of his life to a close as he had opened it—by deserting his son; to his niece he denied his paternity, called his son "a stray dog." In that state of mind he made a visit to some relatives in Missouri, spent some time with them during the fall and winter of 1948–49, and made a will in their favor disinheriting his son.

Respondents offered no evidence.

■ The law governing this case is not new. A person may make a valid contract to leave his property to another at his death by will or otherwise. In order to sustain the alleged oral contract, the proof must be so clear, cogent, and convincing as to leave no reasonable doubt in the mind of the chancellor, not only that a contract of the general nature was made, but that the particular contract as alleged was made, and its terms and conditions clearly shown. Buck v. Meyer, 195 Mo. App. 287, 190 S.W. 997, 998. However, it is not to be understood that the existence of the contract must be shown by direct evidence. Resort may be had to indirect evidence, to extraneous facts and circumstances which tend to confirm the probability that the contract was made, which explain the reason for it and the object it was designed to accomplish, which shed light on the consideration for it, which show the parties' understanding and interpretation of it, 94 C.J.S. Wills §§ 111–114. As

said by our Supreme Court in Thompson v. St. Louis Union Trust Co., 363 Mo. 667, 253 S.W.2d 116, 121:

> "Undoubtedly the proof of the agreement and consideration must be clear, explicit and definite. However, it is not necessary that the agreement be established by direct evidence. It may be supplied by competent witnesses who testify to admissions of the deceased party to the agreement, or an express promise may be shown. Evidence is also admissible of such facts and circumstances, such as relations of the parties, so as to give rise to an implication that such an agreement was made, and such implication may have reinforcement from evidence of the conduct of the parties at the time of making the agreement, and subsequently."

■ This being an equitable action it is reviewable *de novo* in this court. It is our duty to weigh the evidence and reach our own conclusions on the facts. And, as our courts have often said in cases of this kind, "The law of each case must arise from the facts of that case."

■ The evidence shows that Alfred Bealmear's offer was explicit. He said, "Now, son, if you will just change your name from Baxter to Bealmear and treat me as your father, I will give you all I have at my death." To that offer appellant assented; "he said, yes, he would." Shortly thereafter, in the presence of his niece and daughter-in-law, deceased confirmed the making of the contract. The deposition of the niece Utha Richardson was offered in evidence. Miss Richardson testified that "he (Alfred Bealmear) said he was so happy he had found Russell, and Russell had agreed to change his name from Baxter to Bealmear and respect him as his father, and 'I have agreed to will him all I have.' " He said "just about the same thing" on later occasions in the presence of this niece "a number of times." He told her Russell "had agreed to" change his name to Beal-

mear; that he "had accepted the name of Bealmear"; he said, "I have agreed to give Russell all I have" when they were talking about what disposition was going to be made of his property after his death.

Turning now to the "relation of the parties" which, according to the Thompson case, supra, may "give rise to an implication that such an agreement was made," we find this situation. Here was a father dealing with a son he had shamefully deserted in infancy and neglected for the next thirty years, to whom he wished to make amends, who acknowledged his fault, declared his desire "to make up for lost time", and expressed the hope that he "could get things straightened out in the near future" so he could "die honorable and leave nothing in a tangle." In his very first letter he mentioned his concern about the disposition to be made of his estate and disclosed his purpose to effect a reconciliation with a view of providing an inheritance for his son. "But", he concluded significantly, "you cannot share in my estate in Baxter's name." The contract sought to be enforced is in exact accord with the tone of those early letters.

Let us then look at the picture from the son's standpoint. To him, Alfred Bealmear was a stranger. He was under no legal duty to recognize and respect him as a father, and the earlier conduct of the father left him under no moral obligation to do so. Appellant was then 33 years old, the head of a family, established and secure in his community among people who knew him only by the name Baxter. The monument in the cemetery erected in memory of his little daughter bore the name Baxter. A man's name is inseparably linked with his way of life. It is involved in his employment, in his business dealings, in his social relationships and in his daily contacts with the public. Changing it involves a change in all his previously established relationships, with attendant risks and apprehensions not only for himself and his own future but for his immediate family as

well. The testimony shows that for nearly two years after appellant learned his father's identity he withheld the filial recognition the old man so ardently desired; declined to assume gratuitously the burdens and hazards of changing his own identity in the community in which he had so long been established. But on the occasion of the old man's 1926 visit he and his family did accept him as his father and did change their name to Bealmear, and did make a new life for themselves in a new community under their new name. From that time on they used the name Bealmear exclusively and continued to treat the old man with filial affection which he had not previously earned, down to the very day of his death. It is difficult to find a convincing explanation of that conduct, against that background, without reference to the alleged contract.

There is also this additional corroborative evidence of the making of the contract. It might be called the "quasi" admissions against interest made by Alfred Bealmear following the year 1926. There were several of them, none very important in itself but collectively significant. There was his niece's testimony that up until the last three or four years of his life he was very foolish about his son, was crazy about him, thought lots of him, said "everything good" about him, wrote him and received letters from him, and was accorded the respect and affection of his son. That conduct is consistent with the contract, and, considering the background history of the parties, can only be referable to it. Then there was the incident of the old man showing his daughter-in-law his farm and filling station property and saying to her, "This is my property; someday I hope it will be yours". Why would he make that statement unless in the back of his mind was the memory of his contract and the hope that his son would comply with it? Then there were his two letters in the late fall of 1933, explaining that he had transferred his real estate and his Building and Loan stock to

his stepson's wife to evade a possible judgment for trifling with another man's wife, and cautioning his son to "keep this letter for reference" in case he died. Why give his son that information, unless at that time he expected the son to be his heir and rightfully entitled to the property so secreted? Consider, too, the fact that at no time did the old man evince any dissatisfaction with his son's behavior toward him or ever reveal to the son his purpose to repudiate the contract and disinherit him; otherwise, it may be assumed, the son and his wife would scarcely have spent the last two weeks of the old man's life at his bedside, in filial attention on him. In our opinion, it was the contract, and only the contract, that bridged the gap between this father and his son; that was so natural and reasonable an outgrowth of their earlier separation and the circumstances under which it had occurred; that enabled the derelict father to enjoy for the rest of his life the otherwise undeserved recognition and affection of the son and his family.

█ Respondents insist that we should defer to the finding of the court below. The rule requiring deference to the chancellor's finding applies mainly when the oral evidence is *conflicting*. Smith v. Lore, 325 Mo. 282, 29 S.W.2d 91, 96. The evidence here is not conflicting. Respondents offered no evidence. Nor does the rule extend to evidence in the form of depositions. Creek v. Union National Bank of Kansas City, Mo., 266 S.W.2d 737, 747.

The testimony of Miss Richardson appears in that form. To us it is very convincing. When she was asked on cross-examination how she knew that appellant had agreed to take the name of Bealmear her answer was *"My uncle said so.*

"Q. All you know about this agreeing, you don't know whether they agreed or not. You just heard somebody say they agreed? A. *I heard Uncle Alfred say that himself.*

"Q. You didn't hear them make the agreement? A. No.

"Q. So, when you say, 'He agreed to,' that's hearsay?

"Mr. Glenn: I object to that form of questioning. I doubt if she knows what 'hearsay' means.

"Q. Well, it's what you hear somebody else say. You don't know of it of your own knowledge? A. No. *I am taking his word for it. That's what he said."*

We think that the evidence when taken as a whole clearly shows the making of the contract and its full performance by appellant. The judgment should be reversed and the cause remanded with directions to the trial court to decree specific performance of said contract, and to order that all of the property and estate of said Alfred L. Bealmear, deceased, be delivered over by the respondents to appellant. It is so ordered. All concur.