Bill WATKINS, Minnie Watkins, Wanda Jean Watkins Roberts, and Wylie Edward Watkins, Appellants,

v.

Lizzie WATKINS, Oline Watkins Breedlove, Maggie M. Watkins Allen, Jodie Watkins, Hilary Watkins, and Vardamon Watkins, Respondents.

No. 51241.

Supreme Court of Missouri, Division No. 1.

Dec. 13, 1965.

Motion for Rehearing or to Transfer to Court En Banc Denied Jan. 10, 1966.

Ford, Ford & Crow, Wendell W. Crow, James F. Ford, Kennett, for appellants.

Ward & Reeves, Caruthersville, for respondents.

HIGGINS, Commissioner.

Bill Watkins and Preston Watkins, plaintiffs, sued Lizzie Watkins, Oline Watkins Breedlove, Maggie M. Watkins Allen, Jodie Watkins, Hilary Watkins, and Vardamon Watkins, defendants, to set aside two deeds to real estate from Joe D. Watkins, intestate deceased father of all parties, to defendant Lizzie Watkins. Defendants denied the allegations of plaintiffs' petition and, in the alternative, counterclaimed for specific performance of an oral promise of the deceased to convey the lands described in the deeds to defendant Lizzie Watkins. The trial court found for plaintiffs on their petition and decreed that the deeds be set aside on account of incompetency of the grantor at the time of execution of the deeds; on defendants' counterclaim, the court found all the equities in favor of defendant Lizzie Watkins and decreed specific performance of the contract between her and her father vesting title in her to the lands which had been the subject of and were described in the canceled deeds. Plaintiff Preston Watkins died after the trial and his wife, Minnie, and his children, Wanda Jean Watkins Roberts and Wylie Edward Watkins, were substituted in his stead, and they and plaintiff Bill Watkins have appealed from that part of the judgment and decree which awards specific performance to defendant Lizzie Watkins.

Joe D. Watkins died intestate August 17, 1963, at the age of ninety years. His wife predeceased him in 1919 and he was survived by eight children, the two plaintiffs and the six defendants. Lizzie Watkins was then fifteen years old and her sisters were married and away from the family's Tennessee home. Upon the death of the mother, Lizzie quit school to keep house and help her father raise her brothers. In 1922 the family moved to Pemiscot County, Missouri, and engaged in farming on rented land. The land in question was purchased by Joe D. Watkins in four parcels on four occasions: In 1934, 93 acres of land in Pemiscot County were purchased; in 1941, 44.4 acres were added; and in 1942, 12.1 acres were purchased, making a total of 149.5 acres in Pemiscot County. He also purchased 160 acres in Ripley County in 1950.

Defendants' (and Lizzie's) counterclaim alleged that upon the death of the mother and at the request of her father, "she quit school and devoted her full time to the care of the household of her father and her brothers, and thereafter when her father acquired title to certain real estate in Missouri it was understood and agreed between De-

fendant, Lizzie Watkins, and her father, Joe D. Watkins, that in consideration of the services rendered by Lizzie Watkins to her father and her brothers and in consideration of her continuing to render said services the said Joe D. Watkins would either convey or will to defendant, Lizzie Watkins, the real estate which he had acquired in Missouri * * * (description omitted). * * * that * * * relying and acting on the promise of her father, Joe D. Watkins, to either convey or will all of the above described real estate to her, she continued to perform her part of the agreement aforesaid by remaining continuously in the household of Joe D. Watkins until his death and during all of said time she administered to all his wants, nursed him in illness, assisted him in accumulating said real estate, and performed all of her duties commonly performed in a household, and treated her father with kindness and affection, and her father undertook to perform his part of said agreement by conveying all of said real estate to her by deeds, rather than by will, which said deeds plaintiffs are now seeking to annul and avoid, and in the event the Court should hold that plaintiffs are entitled to have said deeds declared null and void, * * * that in order to fulfill the contract and agreement between Joe D. Watkins and Lizzie Watkins, and by reason of the facts aforesaid, the Court should order and decree the title to all said real estate to be vested in defendant, Lizzie Watkins." Plaintiffs pleaded the Statute of Frauds as a bar to enforcing the oral agreement.

The general warranty deeds by which Joe D. Watkins attempted to convey the lands promised to Lizzie (and which were set aside by the court) were executed at the Pemiscot County Memorial Hospital on July 18, 1963. Mr. Watkins was under the care of Dr. A. G. Shirey of Hayti, Missouri, who admitted him to the hospital June 23, 1963. He was then in a critical and comatose condition and he remained hospitalized until his death. Dr. Shirey assisted in the execution of the deeds by taking decedent's hand and moving it through the motions necessary to making an X mark and the notary took the acknowledgment upon the doctor's assurance. Mr. Watkins could sign his own name prior to his last illness. Defendant Vardamon Watkins recorded the deeds and delivered them to Lizzie.

In respect to the contract with her father, Lizzie Watkins testified:

"Q. Your name is Miss Lizzie Watkins? A. Yes, sir. Q. And you have never been married, is that right? A. No, sir. Q. Miss Watkins, where do you live? A. I live out on the other side of Hayti on Route 1. * * *

"Q. With whom did you live until your father died? Did you live with your father, with him? A. Yes, sir; yes, sir; yes, sir. Q. Now I believe your mother is dead. Do you recall when your mother died? A. Yes, sir. Q. When was that? A. Nineteen nineteen. Q. And how old were you at that time? A. Fifteen. Q. And up until that time had you been going to school when school was in session? A. Very little. Q. Then after your mother's death did you go to school any at all? A. No, sir. Q. What did you do after your mother died? A. I taken care of the children. Q. And how many children were there at home? A. Five. Q. Did you have some older sisters? A. Yes, sir, but they was married. Q. Now, do you recall about when your father moved to Missouri? A. Nineteen twenty-two. Q. And what did he do after he came up here? A. Farmed. * * *

"Q. Now, do you recall the first land that your father owned or bought, the first land that he bought up here? A. Yes, sir. Q. Do you know how many acres he bought the first time? A. Ninety-three. Q. And you remember about what year that was? A. I believe it was in '34, I believe. Q. At the time or before he bought this land did he have a conversation with you about what was going to be done to this land? A. Yes, sir, he did. Q. All right. Tell the Court what he told

you and what you agreed to, if anything. * * * A. He asked me was I going to stay with him until he got the land paid for. I says, 'Yes, sir, I will.' He says, 'Well, if you will, at my death the land will fall to you.' That is what he told me. Q. Now, Miss Lizzie, did he make that statement to you later when he bought other land? A. Yes, sir, the same statement. Q. Did he talk over the purchases of these different tracts with you? A. Yes, sir. * * *

"Q. Now, do you recall the incident of buying some land over in Ripley County? A. Yes, sir. Q. That is over around Doniphan? A. Yes, sir. Q. Did he talk to you about that? A. Yes, sir. Q. What did he say to you? A. He told me he was going up there and buy some land, says, 'If you'll stay with me at my death the land will fall to you.' Q. Now, was there ever any conversation between you and your father in which he had denied making this promise to you? A. No, sir.

"Q. Now, did you stay with your father? A. Yes, sir; yes, sir. Q. Tell the Court just what you did. A. Well, I done all the housework, took care of the children, and worked in the field. That is what I done. Q. Did you have anything in the way of calves or cattle that you claimed to own? A. Yes, sir. Q. And over what period of years was that? A. Well, that was in '51, I believe; I believe in '51. Q. What did you do with the cattle or calves that you had? A. I sold them and paid the last payment on the land at Doniphan. Q. And how much did you get and how much did you pay? A. Six hundred and something was the payment on the land. Q. Did you have any income at all except what you labored for? A. No, sir. Q. When you worked on the farm there for your father did you receive compensation from your father? A. No, sir. Q. Did he ever pay you any cash money of any kind? A. No, sir. Q. Did he ever give you any property of any kind? A. No, sir. Q. Did you ever have any spending money? A. No, sir. Q. Did you ever have an occa-sion to use any spending money? A. No, sir. Q. Did you ever come to Caruthers-ville? A. No, sir. Q. Did you ever go to Hayti? A. Very few times. Q. Who bought the groceries for the family? A. Brother. Q. Could you tell us offhand how many times you have been in Caruth-ersville prior to your father's death, before he died? * * * A. I don't think I was in Caruthersville over three times. * * *

"Q. Miss Lizzie, who bought your clothes? A. My sister back there. Q. Do you have any nice clothes or anything? A. Sir? Q. Do you have any nice clothes? A. No, sir, none only what she has brought me; her and her daughter back there is what brought my clothes. Q. You mean the daughter of your sister? A. Yes, sir. * * *

"Q. I believe you testified that you worked in the field? A. Yes, sir, I did. Q. And what did you get for doing that? A. Not anything. * * *

"Q. Lizzie, did you talk to your father while he was in the hospital? A. Yes, sir. Q. And did he make any statements to you on or about July 18th? A. Yes, sir. Q. With reference to the land? A. Yes, sir. Q. What did he say to you? * * A. He told me to have those deeds made and bring them to him so he could sign them. Q. You have reference to the—had he had an operation? A. Yes, sir. Q. Now, where was he when that statement was made? A. At home. * * * Q. Now, Miss Lizzie, did he make the state-ments to you about getting the deeds fixed at any time later? A. Yes, sir. Q. And when was that, the next time? A. Well, it was, oh, about a week before he had them made, I imagine. Q. About a week before you got them made, you say? A. Yes, sir; yes, sir. Q. And what did he say at that time? A. Well, he said, 'I want you to have the deeds fixed.' Q. Where were the deeds, that is, not these but the ones where your father bought the property? Where were they; who had them? A. I did. Q. Where? A. At home. Q. And

after these deeds here were recorded did you have them, too? A. Yes, sir. * * *

"Q. Did you expect throughout the years after your father had purchased the first tract of land—did you expect that your father would carry out his promise to you to deed it to you? A. Yes, sir; yes, sir."

Lizzie's testimony was corroborated by the testimony of Vardamon Watkins as to her having done all the housework for her father and any of the children living at home following the death of the mother. He testified also that prior to his father's hospitalization for his last illness, his father had told him "he wanted me to fix it so she could have that land, not one time, but time on time over. * * * He said, 'You go fix it for her; bring it so I can sign it.'" Such discussions and instructions took place at the Cape Girardeau Hospital in May and later at the hospital in Hayti around July 17. In respect to the promise to convey to Lizzie, he testified:

"Q. * * * did your father make any statements to you about this land? A. Yes, he told me. Q. When was the first time? * * * A. It was the first time he ever bought that land. * * * He told me he wanted her to have it, said it was hers. Q. All right. When he bought the second piece of land or within that range or period of time, did he make any statement to you about the land? A. The same statement he made the first time. * * * Q. * * * do you know of any money that your father ever gave to your sister Lizzie? A. No, sir, I never knowed of him giving her one dollar. Q. Do you know of Lizzie having raised some calves and sold them and used the money? A. Yes, sir. Q. For what purpose? A. She made the last payment on that land up in Ripley County. Q. Do you know how much that was? A. Six hundred and something dollars. Q. Do you know of any other things that Lizzie had earned and turned over to the benefit of her father? A. Anything that she had, it went right on this land just like it was his."

Hilary Watkins also corroborated Lizzie. In respect to what his father said, he testified: "He said he wanted her to have the land; that is all I know. That is all I recall, and that is all. I don't know anything else. I just know that he said he wanted her to have it. Q. Did you hear him make any statements after the year that he bought the land? A. Yes, sir, all along he said he wanted her to have it, every time. Q. Do you recall the event when he bought another 44 and 4/10 tract of land? A. Yes, sir. Q. Did you hear him make any statements about that time? A. Yes, sir, he stated the same thing; he wanted her to have the land. That is what he said."

Jodie Watkins also testified to hearing his father make statements that he wanted Lizzie to have the land and said it was because Lizzie took care of the home and household duties for her father. He testified also that Mr. Watkins had given financial help to all the boys and had built houses for them to live in on the land in question but that he had never given Lizzie anything.

Oline Watkins Breedlove testified to a conversation with her father in the year he died: "* * * he told me that he wanted Lizzie—before he got sick he told me he wanted Lizzie to have the land, and he said that he didn't—that she stayed there with him and worked awful hard and helped him pay for the land and he wanted her to have it * * *. Q. Did you ever on any other occasions hear your father make any statements? A. He has told me that all the time. Q. What do you mean 'all the time'? A. All the time that he wanted Lizzie to have it because she had raised the children, took care of the children, and that was all the help he ever had."

The testimony of Bill and Preston Watkins and their wives disputed the nature of the financial help given them by their father in respect to the houses they occupied, in that they placed the amounts contributed by their father at lower sums. They admitted that Lizzie had done all the work attributed

to her; however, their theory of the father's intended disposition of the property, from the testimony of Bill Watkins, was that "(h)e wanted each and every one of his children to have a part and have a home."

■ This action in equity is to be reviewed de novo on the record and we must make our own findings of fact, draw our own conclusions of law, and enter or direct the entry of the judgment thus indicated, giving due deference to the trial judge on matters of conflicting evidence. Cleary v. Cleary, Mo., 273 S.W.2d 340, 346 [10–12].

Appellants contend that respondents failed to make a case for specific performance because no enforceable contract was pleaded or proved; there was no certainty or definiteness as to offer, acceptance, essential elements and subject matter of an enforceable contract; there was no consideration; intestate's alleged statements were ancient and casual and could only support testamentary disposition; that any services performed by Lizzie Watkins were not unequivocally and solely referable to the contract sought to be enforced; that the services were presumptively gratuitous; that Lizzie stayed with her father because she wanted to rather than in reliance upon an oral contract; that the evidence was not so clear, cogent, and convincing as to remove reasonable doubt.

■■ When an oral contract made with a deceased has been performed by the party still living and it would be a fraud on that party to enforce the statute of frauds, equity will interfere to decree specific performance of the contract; but the party seeking specific performance will be held to clear and convincing proof and the agreement must be explicit and supported by adequate consideration. Easley v. Easley, Mo., 333 S.W.2d 80, 83 [1]. The circumstances under which a court of equity will enforce an oral contract with a deceased person are: "(1) the alleged oral

contract must be clear, explicit, and definite; (2) it must be proven as pleaded; (3) such contract cannot be established by conversations either too ancient on the one hand, or too loose or casual upon the other; (4) the alleged oral contract must itself be fair, and not unconscionable; (5) the proof of the contract as pleaded must be such as to leave no reasonable doubt in the mind of the chancellor that the contract as alleged was in fact made, and that the full performance, so far as lies in the hands of the parties to perform, has been had; (6) and the work constituting performance must be such as is referable solely to the contract sought to be enforced and not such as might be reasonably referable to some other and different contract; (7) the contract must be one based upon an adequate and legal consideration, so that its performance upon the one hand, but not upon the other, would bespeak an unconscionable advantage and wrong, demanding in good conscience relief in equity; (8) proof of mere disposition to devise by will or convey by deed by way of gift, or as a reward for services, is not sufficient, but there must be shown a real contract to devise by will or convey by deed made before the acts of performance relied upon were had." Walker v. Bohannan, 243 Mo. 119, 147 S.W. 1024, 1028 [1], 1029. See also Forrister v. Sullivan, 231 Mo. 345, 132 S.W. 722, 730–731; Russell v. Sharp, 192 Mo. 270, 91 S.W. 134; Roberts v. Clevenger, Mo., 225 S.W.2d 728; Willey v. Talkington, Mo., 312 S.W.2d 77, 79 [2]; Steere v. Palmer, 359 Mo. 664, 223 S.W.2d 391, 393 [2, 3]; Burt v. McKibbin, Mo., 188 S.W. 187, 191 [2]; McFall v. Hampe, Mo.App., 267 S.W. 54, 57–58 [3].

The trial court found the facts on the issue of specific performance to be as testified by Lizzie Watkins and those who corroborated her testimony. We have drawn the same conclusion and proceed to determine whether that evidence meets the test set out above to support a decree of specific performance.

Appellants contend that the alleged conversations upon which contractual obligation is sought to be founded are too indefinite, uncertain, and vague to constitute an offer capable of acceptance. John Deere Co. of St: Louis v. Short, Mo., 378 S.W.2d 496, 503 [8,9]; Burger v. City of Springfield, Mo., 323 S.W.2d 777, 783 [2–5]; Bengimina v. Allen, Mo.App., 375 S.W.2d 199, 203 [3,4]; 17 C.J.S. Contracts § 36(2), pp. 647–651. The contract here was that if Lizzie would continue to devote her full time to the care of the household of her father and brothers, the father, Joe D. Watkins, would convey or will the land being then acquired to her. Lizzie testified that at the time of the purchase of 93 acres in 1934: "He asked me was I going to stay with him until he got the land paid for. I says, 'Yes, sir, I will.' He says, 'Well, if you will, at my death the land will fall to you.'" According to her, the father made the same offer and promise at the time he purchased the other lands, and all such testimony was removed from the realm of being loose, casual, remote, or ancient because it was all corroborated by other witnesses. This, taken with the other circumstances of the case, is certainly explicit, clear, and definite, both as to pleading, proof, and meaning, and it is not necessary to definiteness that the contract be detailed. Smith v. Lore, 325 Mo. 282, 29 S.W.2d 91, 95 [1,2].

Appellants say that Lizzie's acceptance of her father's proposal was not sufficient because she wanted to remain at home as opposed to being induced to do so by her father's proposal. Lizzie testified that she wanted to stay with her father; however, she stated also that she expected her father to fulfill his promise to deed the land to her. In making this contention appellants rely on Collins v. Harrell, 219 Mo. 279, 118 S.W. 432, but the situation there is readily distinguished. The offer there was if she (the beneficiary) stayed with him (the benefactor) he would give her a farm. The beneficiary alleged full performance and sought specific performance which the trial court denied. The circumstances of the beneficiary were such that she would have had nothing if the benefactor had not taken her in where she "was not called upon to make any sacrifice whatever, but simply to continue to receive the same protection and support and care that he had already generously given to her, * * *." 118 S.W. l. c. 441. That was entirely different from Lizzie's situation where, at age 30 or 31, she gave up her right to leave her father and agreed to stay with him and do all his household chores including caring for any of his children in the home. From that point on through the acquisition of other properties she sacrificed that right and herself to the welfare of her father, going without any niceties or luxuries in order to help her father pay for the lands which he promised to her and which she expected him to convey to her.

Akin to the foregoing contention is appellants' contention that as to consideration, "there was no detriment, loss or change of position to the alleged promisee in her continuing to remain at home and carry on as she had done previously." In support of this position appellants again cite cases, Rosenwald v. Middlebrook, 188 Mo. 58, 86 S.W. 200, Brevator v. Creech, 186 Mo. 558, 85 S.W. 527, Sitton v. Shipp, 65 Mo. 297, Schertz v. Blocher, Mo.App., 288 S.W.2d 385, Wallace v. Shanks, Mo., 221 S.W.2d 873, and Feiden v. Gibson, Mo., 218 S.W.2d 105, which are readily distinguished because they involve situations of testamentary disposition or where the promisee retained or obtained a position of betterment or even luxury without future effort or sacrifice to constitute a consideration by performance on the part of the promisee. In contrast, it is admitted that Lizzie expended all the effort and her earnings as she said she did. Even though she wanted to stay with her father, she gave the consideration asked of her and she expected her father to fulfill the contract and thus compensate her for performing her part of the bargain. By not exercising her right to leave the home and abandon her contract, her performance is

referable to the contract with her father and none other, and any presumption of gratuitous services is rebutted by this and the evidence of her earnings being used to pay for the farm.

■ Appellants say that the contract is unfair and unconscionable because its enforcement deprives them of an inheritance, and this is akin to their contention that the equities favor them. Appellants made no claim for specific performance of any agreements from which they may have hoped to benefit, and matters of expenditures made by appellants on the subject property and promises alleged to have been made to them were heard, considered, and obviously rejected by the trial court in finding the equities in favor of the respondents generally and in favor of Lizzie particularly. In view of the services and work performed and the sacrifices made by Lizzie, it is clear that the equities favor Lizzie and the contract by which her equities are established is thus not unfair or unconscionable.

Appellants charge reasonable doubt as to the occurrence of the conversations attributed to decedent by which Lizzie would make her case, and point to testimony from appellants to the effect that they were promised homes on, and a part of, the land, and to the action of the court in voiding the deeds contrary to respondents' testimony. These are matters of conflict in the testimony in which we defer to the superior opportunity of the trial judge to note the credible testimony and act thereon, and there is nothing in the record to indicate any doubt as to cause us not to defer to his finding.

Appellants contend also that there was no contract "made before the acts of performance relied upon were had," and that the evidence will support only a finding of mere intention to reward. In rejecting this contention, we refer to the portion of the contract previously set out from which it clearly appears that the contract was made for the purpose of securing services from Lizzie and of compensating her for those services to be performed by her in the future, even though similar services had been performed prior to entering into the contract, and the evidence supports the contract alleged by defendants.

■ Without going into further detail, it thus appears that the evidence in this case complies with rules and conditions set forth in Walker v. Bohannan, supra, and such evidence clearly shows that the contract as alleged by respondents was entered into by respondent, Lizzie Watkins, and her deceased father, Joe D. Watkins. It appears also that the contract was fully performed by Lizzie, and that equity should decree the performance which the deceased failed to render or which he was prevented by incompetency from performing. Such decision is supported by similar circumstances in Roberts v. Clevenger, supra; Easley v. Easley, supra; Jennings v. Achuff, Mo., 272 S.W.2d 263; Smith v. Lore, supra; and Glauert v. Huning, Mo., 266 S.W.2d 653.

■ Appellants contend also that the court erred in admitting testimony from the respondents because they were disqualified by Section 491.010, RSMo.1959, V.A.M.S. (Dead Man's Statute). The record shows that plaintiffs served interrogatories on, and obtained answers to them from, defendants after commencing this action to void deeds. This, of course, constituted a waiver of the incompetency of defendants as witnesses, Lehr v. Moll, Mo., 247 S.W.2d 686, 690 [6], Edwards v. Durham, Mo., 346 S.W.2d 90, 99 [4, 5], Ess v. Griffith, 139 Mo. 322, 40 S.W. 930, and it is of no consequence that the interrogatories were filed and answered before defendants' amended pleading was filed by which they sought specific performance, because the pleadings in a case are open until the cause is finally submitted for determination.

■ Finally, appellants claim that the court unduly limited them in the cross-examination of a witness who had been a remainderman in a conveyance made under circumstances similar to those surrounding

**612**

the deeds in this case, and that absent the limitation they would have been able to develop reflections on the credibility of that witness and of the respondents as witnesses. The objection to the testimony sought was that it was wholly immaterial to, and had nothing to do with, the lawsuit in trial. The objection was sustained and the answer stricken. The offer of proof was that the witness would testify to being a remainderman in a deed executed when the grantor, his father, was paralyzed and under treatment by a doctor. The offer does not mention a bearing on the credibility of any witness, the testimony sought was immaterial and not relevant to the issue, and the ruling denying the offer was thus a proper exercise of the trial court's discretion.

Accordingly, the judgment is affirmed.

HOUSER and WELBORN, CC., concur.

PER CURIAM.

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

All concur.